Case number 23-1738, Laska Renewable Investments LLC, Affluence v. Kingdom of Spain. Mr. Miguel for the Affluence Asset Renewable Investments LLC, Ms. Harris for the Embolid Kingdom of Spain, Ms. Faye Anijuskiri for the European Commission, Ms. Wengel Anijuskiri for the United States of America. Good morning Mr. Miguel, you may proceed when you're ready. Thank you. Technically, good afternoon. Good afternoon Judge Pillard. Is Judge Rogers joining us? Oh, good question. I believe... I've been here during the entire... Excellent. But I muted myself and I turned off the video. Thank you. Um, thank you Judge Pillard and may it please the court, Matthew Miguel for Lasket. In this round two, I would like to start with the arbitration exception. The Supreme Court's decision in BG Group and this court's decision in Stilex demonstrate that there is jurisdiction in this case under the arbitration exception. The central lesson of the Supreme Court's decision in BG Group is that an investment treaty is more than just a unilateral standing offer to investors. It is, quote, an already formed arbitration contract among the signatory states. In the language of the FSIA then, that investment treaty is an agreement to arbitrate by states made for the benefit of private investors. The Energy Charter Treaty is such an investment treaty. In Stilex, Moldova argued it did not consent to arbitrate with the investor before the court, but this court held that Moldova's signature on the treaty itself suffice to establish the arbitrator's jurisdiction. That was because under BG Group, the Energy Charter Treaty itself was a contract. If the arbitrator's jurisdiction had depended on the existence of an agreement with that particular investor, then the existence dispute would have needed to have been resolved before the court could have determined that Moldova agreed to delegate arbitrability questions to the tribunal. This is different though because that had to do with the issue as opposed to the party. No, because Spain's argument here is similar. It says it did not consent to arbitrate. Just as in BG Group, its argument was it did not consent to arbitrate. The argument is about the scope of the consent by the investor state, and here, the foreign state here argued it didn't agree to arbitrate this dispute, but not others. That's Stilex, and this court says that's a question of arbitrability. But they're saying we didn't agree to arbitrate with any EU investor. That's a different question. That's who we're arbitrating with as opposed to, yeah, we agreed to arbitrate with Blazkowicz, but only on green energy and not on fossil fuel. It's not a question of the parties having agreement, and we're trying to figure out the details of it. As Spain is saying, no, no, no, no, no agreement with Spain and this counterparty at all. I understand, so I guess I have two points in response. First is that they are both questions about the scope of consent. Different, but they are both questions about the scope of consent. In BG Group, it was we did not consent to arbitration with people who do not fulfill the local litigation requirement. That's a class of investors. In Stilex, it's we don't consent to class with this type of investors, but Stilex actually does involve who, because Moldova's argument in Stilex was that it did not agree to arbitrate with Energo Alliance because the investment actually came through the BVI entity, Deremet. So there was a who issue in Stilex itself. It's not as neatly compartmentalized as Spain would have it. So under BG Group, if you view the agreement here as the agreement to arbitrate, the Energy Charter Treaty itself is the agreement to arbitrate. It is within the meaning of the FSIA, an agreement for the benefit of private parties. That accords, of course, with the whole purpose of the 1988 amendments. In the 1988 amendments that added the arbitration exception, it was to, as the United States says in its amicus brief, it was to streamline, to make easier the enforcement of New York Convention arbitral award in U.S. courts. That was the purpose of adding this exception. It was to eliminate doubt that there was subject matter jurisdiction to looking at the language. I think this is a hypothetical from your opponent's brief. If North Korea comes in and says, you know, standing agreement to arbitrate, we want to arbitrate against Spain and the arbitrators wanting ever more business say, great, we'll arbitrate that. And it's just not the case that any offer was ever made to those investors, but the arbitrators say there was, done. Under the exit convention, that doesn't get out of the gate because exit itself would not initiate a proceeding. Under the New York Convention, you would require a, under UNCTRA rules, there would have to be an arbitral panel that would quickly conclude that there's no jurisdiction here. These panels are not staffed by, by hacks. They are respected international law experts. The second point I wanted to make is that even if you viewed the arbitration agreement as Spain does here at the level of the particular investor, Spain is raising a question of validity or enforceability, not one of capacity or formation. Spain is arguing in essence, that EU law preempts its decision to enter into the energy charter treaty on the point, on the text of its plain terms. Those types of questions of preemption are questions of validity and enforcement. I would point to the ninth circuits case in Unite here local and the 11 circuits decision in addicts. These are not questions that go to for the court. They can be delegated to arbitrators. The question of whether federal law preempts arbitration can be delegated to arbitrators because it is one of validity. And under the Supreme Court's decision in Buckeye check cashing footnote one, validity is not formation. So more, what is more when an EU member state violates EU law, the action of that member state is not void ab initio. EU law does not in fact have preemptive force like US law. Instead under article 260 of the treaty for the functioning of the European Union, it requires the member state to take steps to comply or face an infringement action from the European commission. That is why you have all the EU member states saying, we're going to withdraw from the energy charter treaty. Spain has not yet taken that step, but they have indicated their intention at some point in the future to withdraw from the energy charter treaty in order to comply with the court of justices mandate as set down in Comstroy. And is that a prolonged process? You mean the withdrawal itself? The withdrawal is effective one year after the date of the notice to the energy charter treaty, but the treaty obligations have a 20 year sunset. Um, so finally, I guess the next point I would make is that even if you rejected my validity argument, even if you were viewing this as an issue of formation, it's not obvious to me that Spain should not be bound by its own voluntary submission of this question to arbitrators. Spain itself invited the arbitrators to decide this. And I am aware of, while this is a jurisdictional fact that this court must, uh, it must find an agreement to arbitrate. I'm aware of no precedent that would preclude this court from saying you are bound by your litigation choice to pursue this in front of the arbitrators. Most of the U.S. cases on this are pre-arbitration, but it wasn't first options versus Kaplan was a case afterwards where they went through arbitration, but they're allowed to look back and say, no, no, no, this person wasn't bound. And I think that wasn't the signatory. Right. So I, I, I, I'm not disputing that formation questions generally or for the court under the FAA framework. The question is what is necessary to find a jurisdictional fact under the FSIA? What is necessary to find a jurisdictional fact? And my submission would be that when a party chooses to arbitrate the issue without reservation, they never said arbitral panel, you cannot raise this. You cannot decide this issue. They, they said that they, they raised their intra EU objection, but they raised no objection to the delegation of that precise question to the tribunal. Far from it. They invited the tribunal to decide it. So this is different from other cases where the jurisdictional fact has, it has not been passed upon before. This is one that's been invited the arbitrators to decide, and now it wants a second bite at the apple in enforcement courts. Does that have to be a factual, I guess, finding by the arbitral tribunal to work? So the way I was thinking of it, judge Pan is that it would also apply to mixed questions of contract, but this is, I I'm just using the court's terminology of the existence of an arbitration agreement as jurisdictional fact. And that, that question clearly was litigated before the tribunal at Spain's invitation. And now they want a different result in this court. You're saying, even if we're responsible for determining contract formation, we can just adopt what the tribunal said, if the parties agreed that that's. I am not saying that as a matter of arbitration law, generally, I'm saying that as with respect to the very precise and narrow question of what, what is sufficient to demonstrate a jurisdictional fact to obtain jurisdiction under the SIA. And I'm not aware of any case that says you cannot, you cannot conclude a jurisdictional fact from a prior litigation in which you voluntarily, voluntarily participated and indeed invited. Arbitration. An arbit, well, or, or a litigation for that matter, but in this case, it was an arbitration. I have a choice of law question for you. So the New York convention authorizes the national award. If the arbitrary arbitral award was at the agreement, I'm sorry, it was not valid under the lot of the parties that subjected it, or if there's no indication about that under the law of the status of the arbitration itself. And so that's on the merits. We have choice of law spelled out in the New York convention. And I guess in, in evaluating whether there's an agreement in the first place, do we use that same choice of law analysis? I think at the bottom, I'm trying to figure out, I would think not your honor. I would think that under the FSI, because you're interpreting the FSIA here. So I would think that the question of whether there is an agreement to arbitrate would be one that would be decided under federal law. Well, under, I mean, like under the FAA, we look to state law because it's a contract question. So under the FSIA, in terms of the contract law that would apply, what is the analogous to the extent that there's the same kind of question? Well, then I, I mean, I, I, I think you would look at the energy charter treaty itself, which, because that is the document under which arbitration was conducted here. And article 26 says that you interpret the energy charter treaty in accordance with its terms and international law. So the, the question of whether there is an agreement, I suppose would hold back onto one of international law, but I don't see that as there's no dispute that the energy charter treaty exists. So if you take my, my frontline argument that that is sufficient to establish subject matter jurisdiction, then. Okay. And, and, and Spain has an argument that the energy charter treaty means something different than what you think it means. Yes. And if that's a question about the nature of an agreement, I understand that we look first to the text, we look to international law, but international law doesn't typically have a lot of contract law in it. So let me take, I mean, I mean, this goes straight to the, to the merits of, of Spain's argument. And so let me just address, address the merits analysis here. I would start first with the United States's submission that at least some deference is due to the arbitrator's conclusion here. And second, Spain has raised this argument before 30 different arbitral tribunals against it, and it has lost every one. It has lost this argument indeed with 28 of its own appointed arbitrators voting against it. So it's asking this court to be really an outlier. Except that, I mean, as Harris will say, courts, every court, look at this issue, every court agrees with the EU. That's, that's simply not true. The UK certainly does not agree. The UK held. Right, except in the EU. Well, even, even that is of quite recent vintage. It is simply not true that the EU has always, EU member states have always understood this to be the case since the founding of the Energy Charter Treaty in 1994. I would point to Joint Appendix 398. This is the jurisdictional decision in this case, which is from the Acmea case. It's called Eurico, but that's Acmea. And it says, what is more, the views expressed by the European Commission are not shared by the majority of EU member states, who in fact have expressed different views on this matter. Suffice it to say that the stance taken by the Dutch government in the same Eurico case, in which the Dutch government, taking a diametrically opposed position as the one that all EU member states always understood that they were not allowed to arbitrate under EU law. You raised a question, Judge Pillard, that I think it's important to address. But what, what about, what importance does it have to non-EU members? The importance is that if arbitration is unavailable within the EU, then EU member states have an incentive to choose EU-based investors over non-EU-based investors who could invoke arbitration. That is why it has to be horizontally fair. And all the EU investors will go overseas, and all the overseas investors will go to the EU. I would add that the implications of Spain's argument are quite stunning. It would mean that any decision of the Court of Justice for the European Union could alter the treaty obligations of all EU member states for any number of treaties. The New York Convention fix it, but just a decision of the EU, of the EU, the Court of Justice for the EU would just take the, take the entire European Union out of these treaties, which is, of course, contrary to the terms of those treaties, which provide methods for amending them, methods for withdrawing from them, methods for modifying. I wonder, you pointed to, you know, an earlier time, I think it was 2014, when there wasn't the kind of consensus that seems to be emerging today within the EU. And we were discussing earlier this morning, Article 46 of the Vienna Convention, under which a state may not invoke its internal law and being applied to the EU may not invoke EU law as invalidating its consent to a treaty, unless the violation is manifest and concerns a rule of internal law of fundamental importance. Example in the briefing was if, you know, the President tries to sign a treaty and doesn't have Senate consent, it would be manifest to the world that that was not binding. And so, and I guess my question is, given the coalescence now of the EU, do you have a view on whether moving forward, the Vienna Convention at some point precludes EU investors from relying on the ECT to form arbitration agreements with Spain? Well, first of all, I think that would be a different argument than the one Spain is raising. Spain's not saying that it has permission under the Vienna Convention to abrogate it. It's saying that it never meant what it said. Right. But I'm saying as their view coalesces, I'm trying to appreciate, you know, what wiggle room other than rewriting the EU is on mass and withdrawing from the Energy Charter Treaty. And that is its remedy. If it wants to actually remedy it today, it can get the other member states to agree to the modification that it says has always existed. And my question is really, is there a way under the Vienna Convention? I'm not aware of the Article 46 case law that would permit or would foreclose that possibility. On the injunction, are you still seeking an anti-suit injunction against Spain? No. So, as the court is aware, the district court denied our motion for preliminary injunctive relief as moot because it found no subject matter jurisdiction. Since the briefing, the primary briefing on this appeal concluded, Spain has withdrawn its request for anti-suit relief against us in the Netherlands. And that makes sense because we're now a Delaware entity. So, we don't have an anti-suit issue at this point anymore. I do want to address the fundamental basis for the district court's decision below here, which was that Article 26, Paragraph 6 of the treaty, EU law is international law that supervenes and alters the meaning of the Energy Charter Treaty itself. That is not correct. If it were correct that EU law could modify the meaning of the treaty, so could any bilateral investment treaty between two member states. That is obviously not what the EU, what the members of the Energy Charter Treaty signed up to address. Instead, I would point this court to Medellin versus Texas, the Supreme Court's decision in that case, where it says that even if the treaty violates U.S. law, that means that the treaty cannot operate within the U.S. It does not mean that the United States does not have obligations within the international law domain. EU law operates within its own domain. It operates on that plane alone. It does not change the meaning or content of international law in a treaty that governs not just the EU and its member states, but 56 different member states. There are no further questions. I hope I reserved a little bit of time for rebuttal, as I requested. You requested three minutes? I did. Did my colleagues have further questions? Thank you, Mr. McGill. We will hear again from Ms. Harris for Spain. Thank you, and may it please the court, Sarah Harris for the Kingdom of Spain. I'd just like to briefly touch on three points that Blaskett addressed. First of all, it doesn't matter how you view the Energy Charter or the Puget Agreement. However you slice or dice it, even if you thought that the Energy Charter Treaty itself was somehow an agreement to arbitrate among the members, Spain couldn't and didn't consent with other EU members to arbitrate. Now, the other side seems to assume that agreeing with anyone is good enough to agree with everyone. But notably, their answer to the hypothetical of North Korea appeared to be, don't worry about that. Arbitrators are smart, and we'll deal with that on the back end. That is not a satisfying answer, either with respect to this court's precedence saying that whether you agreed with someone or not is a fundamental question of formation, or other circuits' cases. And I would specifically point to the Lloyds decision from the 11th Circuit and the Al-Qarqani decision from the 11th Circuit, where they said, yes, there might be an agreement with one person, but not the person who's relevant to the consent. So you can't just sort of say, oh, well, agreeing with everyone would be enough. And anyway, as the United States has pointed out, it would be pretty strange to think that the Energy Charter itself is sort of a self-encompassing agreement to arbitrate among member states, given that the text of the Foreign Sovereign Immunities Act Arbitration Act exception refers to the parties having an agreement to arbitrate. The parties really are talking about like the people before the court trying to sue the foreign sovereign in this court. Second of all, you do have the provision about the parties agreeing to arbitrate or on behalf of others. Yes, and so it's the second part that I'm focusing on. It's not just an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration differences. It's differences between the parties. The parties here are investors and things. And I think that text shows that our interpretation has to be correct in terms of the relevance. It seems like, I mean, the FSIA, we've been talking about this all morning, but it seems like it pivots a little inexact in its wording that the agreement between the parties are for the benefit of. And if the parties to the treaty are states of the nature of the bees, but for the benefit of are not states, and then the disagreement or the dispute between the parties, it adheres that the FSIA is using parties in the later clause, describing parties to dispute not to be the same parties as the parties to the treaty. But I think the better view of the FSIA is it's more naturally talking about the people actually before the US court. So you could have a potential agreement, maybe for the benefit of third parties, but the parties are actually talking about like have to have some sort of consent. And I think that also just more... What is your sort of classic case that you think that for the benefit of is referencing? I think for the benefit of you could have... A beneficiary arbitrate under that agreement or no? I mean, let's say you had... I think the person would probably have to have consented because otherwise they are not actually agreeing to arbitrate at all. They could be hailed before... They could be subjected to arbitration they didn't agree to. It would be kind of strange. I think this just tracks the nature of the Foreign Sovereign Immunities Act itself. The idea that foreign sovereigns actually have to have consented to be in US courts in a pretty clear way or have done through their contact that sort of consent. Anyway, regardless, just looking at the energy charter treaty one way or another, the baseline concern remains. Under the other side's view, they seem to think that everything reduces to a question of scope that is always arbitrable. I'm not sure what would remain of this court's decision. It believes that this court's decision in Mikula, even at the distinction drawn in Stilix itself, their case that they rely on over and over again, it would make no sense for this court to have said, wait a minute, Moldova's argument is not really an argument about the formation of an agreement. What they're trying to do there is backdoor a question of scope. Was this an investment or not to try to say, oh, we didn't agree to that type of dispute, but we agreed to this one. Everyone agreed there because there was no issue of intra-EU issues with the parties there, that there was some sort of agreement. Again, the only question was, did they agree to this particular investment or not? And that is what the Supreme Court has said the dividing line is in the domestic arbitration context in cases like Buckeye, and that's what this court has done in the Foreign Sovereign Immunities Act context. So again, it will be really hard to explain what this court has actually done in Foreign Sovereign Immunities Act cases if it just didn't matter, and if all you could do is say any sort of dispute over who can sign an agreement or whether they had the power to do so always reverts to arbitrability. Just look what the arbitrator did and we're done here. Third of all, just the view that you should look at the arbitrator's win-loss record and the votes for investors as somehow probative of what treaties mean is a crazy way to understand what treaties mean. Certainly not the way the Supreme Court or this court has ever interpreted a treaty, and not a good road to go down. What a treaty means is a matter of both text and signatories' understandings, and this is not a question for the EU treaties of some sort of national law, like the sort of Belize Constitution at issue in stuff of treaties between EU members. Now, of course, it doesn't govern relations between non-EU members, but between EU members, investors included, that is the supreme law above all in international law, and that is what the investors should have known as the sort of clearest rule of the EU system for all time. And so the idea that you should discount how the treaty signatories have understood the Energy Charter Treaty, again, there is no principle or case law that would suggest throw the signatories' understandings out the window because you're at this point in time versus the other one. Is your position that the Vienna Convention Article 46.1 condition has been met since this investment was made, or the provision saying that internal law, here internal EU law, invalidates consent to enter a treaty because it was manifest and concerned a rule of the EU's internal law of fundamental importance? You mentioned that this morning. So our fundamental position is that rule doesn't even apply because it involves internal law. EU law is emphatically international law. Yes, and their position discounts the keeping, which is if it's international law, you look at other treaty conflict rules under which I think we clearly win, however you apply the other Vienna Convention rules. And look, I think we would say even if you wanted to apply the internal law rule, we could satisfy it, but I don't think that's the way of looking at it. Because again, the relevant conflict rules first and foremost should be the specific governing the general or the EU primacy principle, which is you have a dispute. One hand is an EU member, on the other hand is a EU national. The order of priority under international law as set forth in the EU treaties is specifically that EU law takes precedence first and foremost over other international agreements. And again, if you want to look for notice of that, that is not some sort of principle that just emerged recently. There are a ton of European Court of Justice decisions establishing that like way, way, way before these investors even stepped foot in trying to invest. And I have the same question for you that I had for Mr. McGill about choice of law. The New York Convention says national courts should evaluate the validity of an arbitration agreement under the law the parties have agreed to or barring that under the law of the status of the arbitration. Do you agree that that provision also should govern our choice of law analysis for purpose of the threshold FSIA question or no? We think that what governs first and foremost would still be EU law. That is the law first and foremost that the parties- Can we apply different choice of law analysis to the same question when it arises under the FSIA as a jurisdictional question than we would in the merits? You might, but let me just sort of back up and say I don't think it matters in this case because first of all, I think that the relevant choice of law question is, did Spain have the power to agree to the agreement under the FSIA? I think that's your first point of decision because you're asking, is there an agreement? And so under the FSIA inquiry, your question will be what law tells me if Spain has the power to agree or not? We say first and foremost, EU law. I took Blaskett's brief to be saying you apply different Vienna Convention principles like look to what's more specific, look to what's later in time. Our position is if you apply those conflict rules, we still win because again, the EU treaties are international law. They are more specific and also they are later in time given the re-replication of the treaty on the functioning of the EU. So those seem to us to be the relevant rules that have been argued in the case that would apply to this specific question. Now again, if we then pivoted to their other alternative, which is start off in the world where you look at the Energy Charter Treaty, we then just get back into all the arguments about what does it mean that the EU itself signed this treaty? I think I asked you in the last case whether the EU Court of Justice cases actually spoke of Spain's incapacity as opposed to the invalidity of actions taken. And I'm not sure I heard a clear answer whether those are really properly understood as capacity questions. Our position is yes, they are. And let me just give you some specific language. European foods, I think, is the clearest in just synthesizing the line of pieces. And it talks about sort of lacking force. The German High Court's decision Achmea II is also a good way of looking at this because it's obviously applying the relevant EU decisions and trying to figure out what does that mean in the posture of a court trying to figure out what happens to confirm the award or not. And there the court said the agreement is, quote, void ab initio. That's the kind of language that means you didn't have an agreement at all, not some sort of enforceability argument. The other side's comparing this to preemption. And I think that's just the wrong analogy. This is much more like do states purport to enter into a treaty with Mexico? Is that a treaty or not? No, it's not a treaty. States gave up the power to form treaties as part of the Constitutional Convention. And in the EU, with respect to the EU treaties, what happened is Spain and other member states are saying they do not have the power anymore. They're giving it to the EU to have a system in which disputes are exclusively resolved by the European Court of Justice when they are between members and involve EU laws. It will not submit, cannot submit disputes that implicate EU law other ways. And that sort of distinguishes the question we had earlier. What happens is Spain is in a forum against its will trying to deal with questions of EU law. The obligation there isn't to sort of throw up Spain's hands and say, we no longer want to defend EU law. We no longer want the European Court of Justice's decisions to be bound. When Spain is in this forum, Spain is saying apply European law. But the obligation is don't try to circumvent the EU treaties that Spain agrees to follow as paramount law. Don't try to do side deals. Don't try to do side agreements. You can't do that as part of the price of being a member of the European Union, which is a really novel enterprise in this respect of shared sovereignty in the EU. I have a sort of practical question. What do you make of the arbitral panel uniformly or almost uniformly rejecting this view, including international law jurists chosen by Spain or other EU countries? I mean, this is a, you know, this is not the kind of dispute we hear every day. So it's helpful to have bearings on some of these more practical questions. What's going on there in your view? In our view, again, I can't speculate like what is motivating the arbitrators in these panels to say essentially like we think we can keep arbitrating because we don't want to pay attention to European Court of Justice law. I think the problem is on their side, they're pointing to a lot of arbitrators' decisions. And on our side, we're saying what you should be looking at is what the signatories understood and the way that the treaties play together. And I think you just can't credit like what a bunch of arbitrators are saying and like the framework for evaluating how you interpret treaties. That's just not one of the tools that people normally turn to ever as a matter of treaty interpretation. So no, I think you can say, yes, these are those arbitrators, if they're presumptively acting in good faith and on their best reading of the law, they're looking at the same materials you're looking at. Yes. And again, I think this shows like in the international community, there might be like among law professors and arbitrators disputes on these questions, but it would be really strange to say you credit those views over in a treaty that has a bunch of signatories over what the signatories themselves are understanding the treaty to be, especially because the US isn't a signatory to that. Like that's pretty disruptive to the treaty framework. It's all of a sudden people who didn't expect to have intra-EU arbitration, who didn't see it under this treaty, even attempted until 2007, suddenly see, oh, well, what do we do with this? The European court of justice said, this is not a thing, but we're supposed to defer to arbitrators and supposed to sort of... Defer, I'm just asking you for a sort of a, just a real world take on what universe are they operating in from your perspective? I honestly... And I really think it is just a dispute among international scholars over like what to do with treaties. And I think the brilliant point is, has this been a feature that the EU has done with treaties in the past? Yes. That is how the EU has approached other treaties like the WTO, the UN Convention on the Law of the Sea. Those are treaties, like 1995, one of them. And so for this court to say, sorry, if the EU joins those treaties, it doesn't matter. You should have known that you agreed to arbitrate those as well, or had other dispute resolution outside of the EU system. That's a real problem. And both in terms of how those treaties currently operate and what signatories understand. Did you argue about those treaties in your brief? We argued about the WTO and then the UN Convention on the Law of the Sea is a subject of the Ireland decision, which we do rely on extensively. It's from 2006. Right. So yes, those are important sort of context in terms of what people are thinking and what might happen and why Spain hears very broadly about the arguments here. Thank you. Thank you. Questions? Great. Thank you very much, Ms. Harrow. Thank you. May it please the court, Sally Fay for the European Commission. I have just three points to make at this stage. The first is that EU law is absolutely international law, and I just wanted to make sure that there's no confusion about the European Commission's position on this point. It's well accepted that EU member states can enter into agreements regulating the relationships between present and future treaties. And that is precisely what they have done in the EU treaties. The relevant principle is that of primacy. And that's what governs the relationship between EU law and any contrary international agreements. And this is very important to the otherwise member states could simply enter into other international agreements that would undermine and circumvent EU law itself. So if the EU law, if the EU came up with principles that were in variance with the Vienna Convention, those would be primary over the principle in the Vienna Convention or in... So this is, we're discussing here an intra-EU situation, so... When you say primacy, it's like, not only is it international law, but it's above all international law? I'm assuming that the EU treaties have primacy over other international law as far as they, insofar as they are regulating intra-EU. So that would be true of the Vienna Convention? That would be true of the Vienna Convention with respect to internal EU application of it. But that's the whole way that the European system has been constituted. What about your friend on the other side's hypothetical about NATO? What if the EU decided that it violates internal EU policy and norms for members to be in NATO? Would that just take them out of NATO? Well, I think that in that case, there would be potentially a question about the rights and obligations of third parties that are not EU member states to that, to the NATO agreement. And so just to be clear, the primacy of EU law is with respect to the international obligations owed to, between member states. I guess under the ECT, you agreed in a multilateral treaty, which included people not within the EU, that there would be this unconditional consent to arbitration. So isn't it like NATO in that respect that you agreed in a multilateral international treaty to do something? So with respect to the Energy Charter Treaty, yes, it has implications for relations outside the EU. And that is, in fact, that was the sole purpose of the Energy Charter Treaty. It was never intended to govern intra-EU relations. And so it's within those intra-EU relationships that EU law has primacy. So I guess my question is, if the EU and EU countries agree to something in the context of an multilateral treaty to do something that affects intra-EU relations, you're saying that they're not bound by those international treaty obligations, that they can trump it? So I would put it instead by saying that when the EU and member states enter into a multilateral treaty, they are not creating obligations between themselves under the treaty. Instead, the rules that govern our EU law. So the EU's position on this is that the Energy Charter Treaty's substantive provisions do not have any effect with respect to intra-EU relations. So intra-EU investors are supposed to bring actions if they think that they've been wronged by an EU member state. The remedies are in EU national courts under EU law. No, I understand your position. I'm just trying to understand how that relates to your obligations under international multilateral treaties that involve parties that are not just within the EU. Yes. And so with respect to parties that are outside the EU, there are obligations under the Energy Charter Treaty, and that's why non-EU member... No, but I'm trying to sort of zero in on if you commit in an international multilateral treaty to do things, including with respect to people within the EU, you think you can abrogate that. Just hypothetically, say you did commit to that within the ECT. You made commitments to people outside of the EU that you would do certain things, including within the EU. You think you can abrogate that based on EU law. So I do think that EU law would have primacy within the EU if it's not affecting the rights of third countries or third country parties. The rule of primacy really is about the... So what if it does affect the third party countries? Because there was an argument that it creates incentives for EU states to favor EU investors, because you don't have to arbitrate. So if we're talking about the rights of third countries or the rights of third country investors, those rights are valid and they're live within the treaty. So what if your position contradicts the rights of these third party investors? The primacy would not apply in that particular situation. It wouldn't? So it's not... I think what Judge Pan is arguing is arguably it's not fair and equal treatment as between potential within EU investors and foreign investors. They're coming to Spain to invest with different procedural recourse and that itself might have implications to the non-EU parties. Yeah, I think you just conceded that your position would not hold if it affects non-EU parties. And I gave you a hypothetical where it does. And you're saying then... Under this very treaty. Under this very treaty. And so now you're saying that EU law isn't, doesn't have primacy. So I just want to make sure that I actually, that I am understanding the question that you're asking. The issue is, I said, what if you make promises that affect people who are not within the EU in the context of this multilateral international treaty and you've promised to do things under this treaty that do affect intra-EU relations, but that would affect the third parties. And you said that an EU law wouldn't have primacy. And so who, in this hypothetical, the parties that are trying to invoke the protections of the energy charter treaty are the third country investors or are they... No, that what your friend on the other side said was that if there's... It does affect the non-EU members of the treaty because EU nation will favor EU investors because they don't have to arbitrate with them. So that is detrimental to all the other non-EU parties to the treaty and they're affected. And I believe you just said that EU law would not have primacy. So I think that's not the kind of situation where we are talking, where that would be an issue of a right or obligation owed to third country investors under the energy charter treaty itself. So what's the answer to my hypothetical? So under the hypothetical where you have an EU investor that is saying that they should be... No, I'm just saying as a general matter, EU primacy will hurt the members of the treaty who are not from the EU. In a more attenuated sense than the idea that the EU and its member states have not... They must respect primacy as it applies within European Union to intra-EU relations. The focus of my question is why is it that the EU can abrogate terms of a treaty that affects people who are not from the EU? It's an international multilateral treaty. So in terms of how it is affecting other members of that treaty that are not... So you agree that they can't do that if it is affecting members who are not part of the treaty? If it is affecting member states that are not part of the EU. So if it is going to affect the treaty rights and obligations owed to those member states, then primacy is not pictured. But I don't understand your hypothetical to be a situation where the EU rules would be affecting the rights and obligations owed under the treaty. I'm just trying to get to a basic premise, which I think you agree with, which is that if the EU has obligations under an international multilateral treaty, it cannot unilaterally abrogate them. Yes, I think that's correct. Okay. All right. Moving on to the second point that I wanted to make at this stage, it's just really about the theme of unfair surprise and unfairness to the investors here. The notion that the investors are somehow being treated unfairly and have been surprised by developments in the EU is a false narrative for at least three reasons. First of all, I think it's important to recognize that intra-EU investor-state arbitration is a recent phenomenon. The first intra-EU bilateral investment treaty case was brought in 2005, and the first intra-EU energy charter treaty case was brought in 2007. That's a case called Electro-Bell versus Hungary. And so when these cases started emerging, the commission acted immediately to raise questions about at least the potential incompatibility between this type of dispute resolution and EU treaties. And you can see references to some of those statements at page 477 of the Blasket Joint Appendix. That's in Spain's Hindalong Declaration. Regardless, at least as early as 2006, and that's already five years before any of the investors in these cases attempted to invoke Article 26, investors would have been aware and on notice of the potential incompatibility between intra-EU arbitration and EU law, even based on the jurisprudence of the court of justice. That's the Mox plant case involving Ireland, where the court of justice held that Ireland had breached the EU treaties by initiating arbitration under the UN Convention on the Law of the Sea against the United Kingdom, which, of course, at that point in time was an EU member state. And so EU investors should have been on notice of the content of the decisions of the EU's highest court on this matter. And finally, there's just the basic point that Acmea and Comstroy, while they are, of course, a more recent vintage, they were applying principles that flow from the EU treaties themselves that have been enshrined in those instruments for many decades. And, of course, also the decisions of the court of justice are retroactive, much in the same way as when a US court issues a decision about the meaning of the statute, it is saying what the statute means and what it always meant. I mean, I really, this is kind of all new to me, all this EU law. I'm trying to understand the incentives of the EU in this case. It seems like the EU has an interest in, I guess, keeping the financial assets of its member states within the government. Isn't that the whole point of this? It's a state subsidy argument. It's like, I'm just trying to understand why the EU thinks it's important that things be ruled on the way you say. And I don't see the importance of uniformity in laws because it's not precedential. And I'm wondering if there's some other motivating reason for the EU to be here. And isn't it in the EU's interest to allow these EU member states to avoid paying these judgments because it keeps the money with governments, which is better for the EU than letting it go to private parties that are energy companies and other investors? So I don't think that the issue for the EU is exactly keeping money within the governments. For the commission, the question really is one of the exclusive competence to regulate state aid within the EU. State aid is a principle that under which governments cannot provide subsidies to businesses or companies operating in the EU. Isn't that one of the premises of the ECT though? Like to encourage investment, they were giving deals to people to come in? Only with respect to investors who are outside the European Union. Putting aside to who? The ECT was to encourage investment and that included incentives. Correct. But it was never intended to apply with respect to intra-EU investors. It was never intended to create rights to EU people already within the EU. Why would the EU enter the ECT if the purpose of it was to provide this state aid that's not authorized? So it was in order to extend the EU's energy policy beyond the EU's borders. So it was creating sort of a framework that would essentially try to encourage non-member states who eventually might accede to the union to bring their legal protections, their laws in line with the EU's internal policy. So it was never intended to authorize the granting of state aid. Can you explain that? Like what was supposed to happen from the EU's perspective? So based on the ECT, it's going to do what? It's going to encourage non-EU nations to join the EU? That was part of the picture. So in the 1990s, this is when the Energy Charter Treaty was negotiated. The idea was that already within the EU, there was an existing energy policy and investment protection for EU investors. And the EU wished to try to extend some of those policies outside the EU. And the way to do that was by negotiating an agreement with countries that were not part of the EU. But I thought you said that the investment protections were unlawful state aid. So you're saying there were different pre-existing protections? There are different rules that govern investment protection within the European Union. And the Energy Charter Treaty was simply never intended to supplant or displace those. And so going back to the question of state aid, the reason why the commission is so concerned about these awards is that an enforcement court outside the EU or for that matter within the EU does not have the ability or competence to order a state to provide aid. Subsidies can only be paid to investors if the commission has specifically authorized that. And the commission has not authorized to date the from the commission's perspective. It's very important that it's not really the judgments that are unlawful. It's the fact that your EU members ever gave any of these investment incentives. They weren't allowed to do that, but they did it. And now the investors are trying to collect on what was promised to them. And you're saying they never were allowed to do that to begin with. So it is both to the extent that EU member states, such as Spain, but also other countries, to the extent that they offered and paid subsidies to EU or other companies without first getting approval from the commission, that is unlawful state aid. And do you think they believe the ECT was the permission? That the investors believe the ECT was permission? Spain did. I don't know what Spain believed at that point. I think Spain should have been on notice of its obligations under EU state aid law to notify the commission. But it did a lot of this. It did a lot of the payment of subsidies. Giving them subsidies. Yes. And the commission's position is that Spain should not have done that without first notifying the commission and obtaining permission to do so. And it's not stated if you pay a subsidy to a non-EU investor? It also may be a question of state aid in that respect. The identity of the beneficiary of the aid is not dispositive of the state aid analysis. It's really whether the payment of an amount would potentially cause distortion of competition within the aid. Then why can Spain pay subsidies to non-EU people that still violate the state aid policy? I think it's doctrine. So the question of, I think the commission's position is that there are state aid implications also for non-EU investors investing in the EU. They also should be on notice of the content of EU law and should be. And I just don't understand the divide that you're drawing between EU and non-EU investors. Is it that the ECT as you read it and Spain reads it, was EU notice and authorization for state aid to non-EU investors? And the mistake was Spain extending that to EU investors? So I don't think that the commission would agree that the ECT itself constitutes authorization to pay state aid. There needs to be a formal process by which the member state notifies the commission of its intent to pay and receives a decision. And just going back to Judge Dan's question about- Then why isn't your position that Spain didn't have the authority to enter any of these investment decisions within EU or external to EU investors because of state aid? So I think the state aid analysis would need to, if there's an award against Spain that's obtained by an EU investor, I think there would still need to be a state aid investigation and analysis of whether Spain can- But why not the non-EU? I think there would also need to be an analysis of that because of the state aid. Why are these awards enforceable as to non-EU investors but not EU investors? At least as far as the court of justice has left the question and it has not yet definitively ruled on the scope of the principles as far as they apply to third country investors, but the court has left that open. But it would be something that the court would need to address in the future. I'm just confused by the EU's position because it just doesn't seem- I don't understand that we're trying to keep the cases in alignment because these have no precedential value. And now I don't understand it's important for EU order because of state aid, et cetera, because there's no reason to distinguish between intra-EU and outside of EU investors. I don't understand the reasons for your position. Yeah. So I'm sorry about the confusion. I think that the fundamental point here is that the commission is the union state aid regulator and it has an interest in making sure that its ability to evaluate and decide on these questions of state aid, whether they pertain to, especially where they pertain to EU investors where the law seems to have been focused, but also in future cases that it's important that the EU commission be the party that is able to exercise its obligations and its regulatory mandate that flow from the EU treaties itself. It just seems that also your interests can be vindicated by allowing these proceedings to happen and then moving for a stay of any execution of the judgment in the United States, and then proceeding with what you're doing already, which is determining whether Spain is allowed to pay any of these judgments. So I think with respect to that, there are a couple of problems. First of all, the mere idea of a body other than the European commission authorizing or ordering an EU member state to pay aid is problematic from the perspective of the commission's exclusive authority in this area. With respect to what should happen in the hypothetical world in which these awards are permitted to be enforced, there would be a complicated cascade of litigation and other proceedings that would need to happen in the EU. So say, for example, Spain were to pay in compliance with the US order, or say even that Spain had some of its assets attacked in execution. So my thought was, say that's all stayed pending whatever you all decide about what Spain can do, what would happen? So then the EU would still be, I think the basic point about another entity having ordered the payment of aid, I think that is still fundamentally a problem for the commission and one that it would take strong issue with. But I also think your point that if further proceedings were to be stayed, the practical consequences might not be the same, but I just lay out for the court some of the practical consequences and what they would be. Because if Spain were actually to pay anything, the commission would be required to order it to recover and claw back any such amounts. A recovery decision itself would be in principle subject to further challenge and appeal within the EU system. And that I think you can take a look at the amicula decision and that case is an example of the very complicated machinations that result from a state actually paying or being made to pay an award that is indisputably unenforceable within the EU as a matter of both EU law and impermissible state aid. Well, I thought that the EU is deciding whether or not it's permissible. Correct. But unless and until the commission actually issues a decision authorizing, it is impermissible. It puts Spain in a difficult position because assuming that their assets in the United States are seized to pay the judgment, then within the EU, they would be required to claw back those assets. Correct. Through more litigation against the petitioners in this case or the investors in this case. Correct. And unfortunately, that is the bind that Spain would find itself in. And the commission does not really have discretion not to order recovery. And I think that's, again, highlighting why Spain actually went to the court. So what are the proceedings going on to decide whether or not Spain can pay these judgments or not? Like, how does that work? So Spain has notified the EU, the commission of these awards. And just I think this goes back to an earlier question about what is, when is, what is the aid here? It's not only the original subsidies, but the court has also held that the payment of, and the commission understands that the payment of an award, an award itself, would constitute aid. So Spain has notified the awards to the commission. The commission is reviewing those. While it is reviewing, it is impermissible and unlawful for Spain to pay anything. So does the EU just have discretion to say you can pay these awards? It would, there are laws on factors for when it would be permissible to pay state aid. I think given the way that the commission's decisions and the court's jurisprudence has developed on this point, I think probably it would be quite unlikely that these awards could be paid just based on the way that the principles have been developing. And I also would point out that there is no principle of state aid law under which an order from, you know, a national court, whether it's in the EU or outside the EU, would be a reason to excuse Spain from a recovery obligation. So again, I think that that simply is to underscore the complicated questions that are posed by, by these particular awards and the notion that this will be settled. Can the EU and Spain and these investors all get into a room and just settle this? In terms of, in terms of I think that that too could, could pose some serious questions. I, I, I don't know what the, the contours of all this would be, but. I'm just wondering, can the EU actually, does it have authority to enter settlement negotiations along with Spain and these investors and just work this out? In terms of the, the authority, I, I, I, I don't know for sure the answer to that, to that question, but. Because I guess the EU could come to the table and say, well, we'd be willing to waive or I guess allow payment of this much as state aid as part of the settlement and withdraw the clawback. Under, under, under existing state aid law, I don't know whether that would actually be possible given the, the, the, the content of state aid laws it stands. I mean, you know, whether, whether the law would be or could be amended. I mean, I think that then we were really straying into, into things that are happening because it just seems like I'm not an expert on international law, but this case cries out for settlement, just looking at just the complexities involved and different. I, I agree with you about, about the, the, the very high degree of complexity of this case. And I think that, that really underscores why, again, it would be extraordinary for, I think this court to take the, the bold step that the particularly given that the United States is not a party to the energy charge treaty. The bold step of, of, of allowing the enforcement of these awards and, and seeking an anti-student junction. I understand that Blaskett is no longer seeking an anti-student junction, but enjoining a foreign sovereign and preventing the European commission from being able to enforce and carry out its regulatory mandate under the state aid regime. And it's not extraordinary to just enforce a, an award under the exit, which, you know, Spain is a party to, that's an extraordinary. Well, I think the bold step, especially in this case where if it continues in the district court, the court will have a chance. You know, there, there are more bases under the New York convention to hold that awards on its merits, even if jurisdiction is recognized. So what would be bold about allowing this to go forward and have the arguments about validity or not be vetted before the court? So I think that the court still needs to, even before you get to the questions about the merits and whether enforcement could be permitted or not under the New York convention. You know, of course, the threshold jurisdictional question of whether there is an arbitration agreement. And here where the court of justice has spoken, has, has reached that conclusion based on longstanding principles of EU law. And, and these are principles also that are fundamental to the EU legal order. And where, you know, I think that if, if you are choosing between two positions and two interpretations of this treaty language, one of which is consistent with the views of the European courts and every relevant sovereign here, including the home countries of the investors, if you're choosing between that and, and on the other hand, an interpretation that would go against that uniform consensus, that would open the door to all sorts of disruption within the European union. I think there is a role for, for deference here. You don't think still X effectively and Chevron effectively require us to hold that there's dristers. I don't, I think that those cases all in none of those cases, was there a dispute about whether there was an arbitration agreement there, nobody was arguing that there hadn't been an was not to, to the, you know, that, that there hadn't been an agreement created between the people who were trying to arbitrate. And now that the question is fundamentally different. It's a question, whether Spain actually could ever have entered into an agreement with these people, with these parties. I feel like you said the treaty, the award, the, you know, the, the ECT, the award and, and the exit exit for New York convention. I think it was a New York convention case, but so there's the ECT was the agreement to arbitrate in that case. Well, I think bear in mind that that still X, of course, is not an entry case. So there was no argument being made there that Moldova had not, did not have the power to agree to arbitrate the dispute with the relevant. No, but the move was that you don't have to have, you have to get into Moldova and the investor. The intent there, the agreement to arbitrate that because that the ECT was itself. So I think that in the, in the select case, there was in fact, you know, the, the, the, there was an offer and it had been accepted by the investor. And that's simply not what the argument is here. I think it's the date, the question there was the scope of the dispute that was being submitted to arbitration and whether the investment that was being sued about was an investment that was covered by the treaty. And that, again, I think is a fundamentally different question from the one that we're facing here about whether there was ever an ability on the part of, of Spain sovereign to agree to this, to, to arbitrate with an entry investor. Can I ask you, I guess it was represented to us that this argument that you're making, or Spain has made, has been run up the flagpole in a bunch of different arbitration settings and has been shot down. And so I'm just wondering those awards, have they been paid and have you been trying to claw them back or what has happened in those 30 other cases? So in those, in those other cases, I mean, I think the position is probably similar respect to the, to the Spanish awards. You know, they, I don't believe that Spain has actually paid any of them yet because of the stated implications and the commission will need to evaluate an issue, its decision about whether or not the awards can be paid. So it's not extraordinary then because 30 other awards are out there. But they haven't, they're, they're, they're not, they haven't been enforced. Oh, you mean they haven't been confirmed? Yeah, that's correct. Yeah. I mean, I think these are the first three cases that have made it up to the court of appeals. And I think you, you raised a good point that there are multiple other cases involving the same kind of facts. I think there are probably about a dozen others in the district court at the moment. They implicate not just Spain, but there are cases against Italy as well. Cases also against it in Croatia and Poland. So this is not just an issue that's confined to the three cases that the court is hearing today. Thank you. Court has no further questions. Thank the court for the opportunity to present the commission's views. Thank you. Thank you very much. I know it's been a long morning. If the court has questions, I'm welcome to answer them, but otherwise we would just rest on our briefs. I had a question about, so the United States filed an amicus brief in the Nigeria case, process and industrial development versus Republic of Nigeria. And you argued that it wasn't required that there be a valid arbitral award under the Foreign Sovereign only require an arbitration were not a valid one. And I wondered whether, you know, here the question is whether there's a valid agreement, not a valid award. Does the same principle apply or no? I don't think so, Your Honor. I think there does need to be an actual agreement to arbitrate formed as a precondition, whether to compel arbitration or to enforce a resulting award. I mean, I think the point is somewhat different and I think it is consistent with and flows from the text of the FSIA as well, which provides for an action to confirm an award made pursuant to such an agreement to arbitrate. And, you know, obviously under the New York convention, it retains the discretion to enforce an award that is no longer valid in the sense that it's been nullified perhaps by a court of the primary jurisdiction. So I think that is the distinction we've addressed. Thank you again for appearing in our request. Mr. McGill. Big finish. There's been no answer presented to BG Group and it's holding that there is an investment treaty and already formed arbitration contract. That holding is the basis for Chevron's conclusion that the issue there in that case was a scope question to be addressed at the merits. Stilex, Chevron, and BG Group all dealt with challenges to the scope of consent. To be sure, this one comes in a little different packaging, but they all were about the scope of the state's consent. And in each case, this court and the Supreme Court held that those were arbitrability issues meant for the merits. Belize, Al-Qarqani, and Lloyds, none of those cases involve investment treaties. They are instead bilateral commercial arbitration agreements, and that makes all the difference. If the prime minister of Belize didn't have authority to enter into an agreement at all, this bilateral treaty, then that is indication that there would be no agreement to arbitrate. That's not the case here. There is no dispute that Spain entered into the ECT and that it remains in force and effective, at least as to non-EU states. The EU itself, apparently the CJEU, that is, does not view this as a capacity or formation problem. We heard Council for Spain say that this consent is, quote, lacking force or is void ab initio. Those are not formation issues. Those are validity issues under Buckeye check cashing. They are arbitrable. Judge Pillard, you asked about first options and the first option rule. I would point to the first options rule doesn't apply where Libya, quote, independently urged the tribunal to decide issues of arbitrability. That is exactly what happened here. The oddity here is that Spain is seeking a level of review at the jurisdictional phase that it cannot possibly obtain at the merits phase. That turns the whole purpose of the 1988 amendments on their head. It was supposed to streamline the path to enforcement, ensure that there was jurisdiction, not make it more difficult. On the merits here, of course, arbitration decisions are highly relevant to international law arbitration. What is going on here is an overwhelming consensus that EU law does not diminish member states' treaty commitments. It's an overwhelming consensus rejecting this idea of the primacy of EU law within the international law domain. Finally, on state aid, this court, of course, has an unflagging obligation to exercise subject matter jurisdiction where it exists, whatever the European Commission says about state aid. The United States has a treaty obligation to enforce awards. There's a statutory obligation of this court to enforce awards. There's been no finding that the awards in our case are state aid at all. Thank you, Your Honors. The case is submitted.
judges: Pillard, Pan, Rogers